UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

————————————

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 21-00052MJ-001-PHX-MHB |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | March 24, 2021 |
| James Theodore Polzin, | ) | 2:33 p.m. |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

BEFORE:  THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE


TRANSCRIPT OF PROCEEDINGS

DETENTION HEARING/PRELIMINARY HEARING

APPEARANCES:

For the Government:
        U.S. Attorney's Office
        By: KEVIN M. RAPP, ESQ.
        40 North Central Avenue, Suite 1800
        Phoenix, AZ  85004

For the Defendant Polzin:
        Silver Law
        By: JASON MARK SILVER, ESQ.
        7033 East Greenway Parkway, Suite 200
        Scottsdale, AZ  85254


Transcriptionist:
Linda Schroeder
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1          THE CLERK:  Case number 21-00052MJ, United States of

2  America versus James Theodore Polzin, set before the Court for

3  detention and preliminary hearings.

4          MR. RAPP:  Good afternoon.  Kevin Rapp on behalf of

5  the United States.

6          THE COURT:  Good afternoon.

7          MR. SILVER:  Good afternoon, Your Honor.  Jason Silver

8  for James Theodore Polzin.

9          THE COURT:  Good afternoon.  Good afternoon,

10  Mr. Polzin.  Sir, can you hear me and see me?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  Good.  I can hear you and see you as well.

13  We're here for a detention hearing and preliminary hearing.

14  You have a right to be here in person.  We are trying to keep

15  people separated so we don't spread the virus around.

16          We need your permission to handle this hearing over

17  the television.  Do we have your permission to handle this

18  hearing -- actually both hearings over the television?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  Mr. Silver, did your client discuss that

21  with you as well?

22          MR. SILVER:  Yes, Your Honor.

23          THE COURT:  All right.  The Court finds it's in the

24  interests of justice to go forward through the VTC.

25          All right.  Let me first turn to you, Mr. Silver.  How

1    do you wish to proceed, before we talk about what we're doing,

2    on both the detention and preliminary hearing?

3            MR. SILVER:  That's fine, Your Honor.  After review of

4    the complaint and other information, we decided to now waive

5    the preliminary hearing and would like to go forth with the

6    detention hearing.

7            THE COURT:  All right.  Anything --

8            MR. SILVER:  And we --

9            THE COURT:  Go ahead.

10           MR. SILVER:  We've submitted a response to the

11   government's motion for detention hearing, and that was

12   submitted yesterday.  I assume that --

13           THE COURT:  I reviewed all of it.

14           MR. SILVER:  Okay.  Great.  Thank you.

15           THE COURT:  Okay.  Anything to address, Mr. Rapp,

16   before I talk with Mr. Polzin about waiving his preliminary

17   hearing?

18           MR. RAPP:  No, Your Honor.

19           THE COURT:  All right.  Mr. Polzin, you're entitled to

20   a preliminary hearing.  You can give up your right to that

21   hearing.  Your attorney says that he's talked to you, and

22   you're giving up your right to the preliminary hearing.  Is

23   that what you choose to do?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  All right.  The Court accepts the waiver

1    of the preliminary hearing.  All right.  On the issue of

2    detention, I've reviewed the government's motion, the pretrial

3    report, Mr. Polzin's response.  I think for Mr. Polzin's

4    purposes, Mr. Silver, why don't you identify who's here on his

5    behalf.

6           MR. SILVER:  That's fine.  In the courtroom we have

7    his wife.

8           THE COURT:  Make sure he can hear it.  This is really

9    for his benefit.

10          MR. SILVER:  Yeah.  In the courtroom we have his wife,

11   Svitlana Popsii, and then we have a friend of his, a business

12   associate, Leonard -- I don't recall his last name.  He's also

13   sitting next to his wife.

14          THE COURT:  Okay.  Thank you.

15          MR. SILVER:  Thank you.

16          THE COURT:  Mr. Polzin, there are two people here on

17   your behalf, one of whom is your wife.  All right.  The

18   government has the burden of detention here, so, Mr. Rapp.

19          Maybe I should preface this with the Court's initial

20   thoughts, and then we can direct --

21          MR. RAPP:  Sure.

22          THE COURT:  And you're welcome to stay at the table.

23   You can stand there if you wish.  I may be inclined to detain

24   Mr. Polzin as a flight risk because I don't know more about his

25   finances, and I have a number of questions in that regard.  I

1   read the government's motion as requesting detention unless and

2   until the government was satisfied that they had a better sense

3   of his accounting.  Is that the government's position?

4          MR. RAPP:  Well, so that's -- That was filed

5   pre-arrest, and then post-arrest we've come into information

6   that gives us even further concerns about the availability of

7   monies to use as flight.  And I can proceed by a proffer on

8   that when the Court is willing to take that evidence.

9          But at this point we are requesting detention in light

10  of this additional information that gives us real concerns

11  about his finances.

12         THE COURT:  Okay.  I did want to know if there had

13  been a material change, so it looks like we're just going

14  forward with the straight detention hearing.  Why don't you

15  make your presentation.

16         MR. RAPP:  Yes.  So in addition to what we have laid

17  out in our detention motion, a couple other things have come

18  into -- have come to our attention during the course of the

19  investigation.  And one is following the arrest, there were

20  some statements by the defendant to his wife.  She was

21  inquiring about what she was supposed to do for finances.  And

22  he advised her that there were a number of accounts that had --

23  at least characterized as having a significant amount of money

24  in them.

25         And so we even, as quickly as the agents are moving on

1    this case, we don't have our hands around those accounts.  And

2    so those monies would be available for this defendant to flee.

3           Second, that is reiterated on the initial jail calls

4    between the defendant and his wife where he's pointing her to

5    finances.

6           The third one and what is even more concerning to us

7    is in the investigation we traced monies from the EIDL loans to

8    the purchase of a Porsche.  It was a Porsche dealership that

9    the defendant purchased a Porsche for about a hundred and

10   forty --

11          THE COURT:  I read through that.

12          MR. RAPP:   -- four thousand dollars, right.

13          The -- What we've now learned is in going to the

14   Porsche dealership to try to ascertain where that, you know, in

15   terms of forfeiting the asset, I don't think the Court is

16   surprised that if we can trace money from illegally obtained

17   loans, we certainly have the right to seek a forfeiture of the

18   asset.

19          And in talking to the Porsche dealer, he advised that

20   shortly before Mr. Polzin was to leave on a one-way ticket to

21   the Ukraine --

22          THE COURT:  He sold the Porsche.

23          MR. RAPP:  -- he sold the Porsche.

24          THE COURT:  For $120,000.

25          MR. RAPP:  For $120,000.  And we're unable to locate

1    that money right now.  And so that gives us a concern.

2              So those are the three things regarding the existence

3    of money that this defendant might have available to him if he

4    chooses to flee.

5              The other area of --

6              THE COURT:  Let me go back to the three points.  It

7    shouldn't be a surprise that he has bank accounts, that he

8    would be talking with his wife about her accessing bank

9    accounts.  He has significant assets.  He's had a business.

10             Is there something in the calls that suggested that

11   there was something unusual about him giving her information

12   that they had bank accounts?

13             MR. RAPP:  No.  It's just that based upon our

14   investigation, his legitimate money would not be characterized

15   as so significant that she would be able to access the money.

16   That's based upon our investigation of his legitimate business

17   activity here in the United States.  Then of course there's the

18   information in the declaration where he's coming through a port

19   of entry, and he's -- the CBP is questioning him about these

20   light switches that he has in his possession.  There's several

21   of them.  And they're valued at about $70 a light switch.

22             And he represents that he manufactures these switches,

23   these switches that are European or Ukrainian type light

24   switches, and he represents that he manufactures those in the

25   Ukraine.

1          So our concern is that he might have not only monies

2     here in the United States but also business interests and

3     monies in Ukraine that would allow him to reside there with

4     that money.

5          The third area of concern -- I didn't -- The Court

6     wanted --

7          THE COURT:  So do you have any real information that

8     these are significant assets?  Compared to $120,000 in cash for

9     a Porsche, the fact that he might have an account somewhere

10    because of light switches, is there any real information he has

11    significant assets abroad?

12          MR. RAPP:  Only based on what -- I mean, if he's

13    manufacturing -- You know, I mean, if he's manufacturing these

14    light switches --

15          THE COURT:  Do you know how many he's manufacturing

16    and how many he's sold?

17          MR. RAPP:  We can only go on what he tells CBP, which

18    is -- And I'll quote it from their actual report.

19          THE COURT:  The reason I ask is if you want me to

20    consider that, I have to have some basis to believe that that's

21    an actual concern that there's enough money there that that

22    would be alluring to someone to leave.

23          MR. RAPP:  Well, the comments on January 29th of 2021:

24    Traveling to Phoenix where they have a vacation home that they

25    are currently renovating.  Bag exam revealed personal goods and

UNITED STATES DISTRICT COURT

1    European style smart home light switches which were larger and

2    shaped differently than U.S. switches.  Subject stated his

3    company manufactures the switches, and he's bringing them for

4    personal use to attempt an install in his vacation home here.

5    He had five switches valued at 70 each and several inexpensive

6    covers.

7            So the concern is that -- Let's just -- Based --

8            If he is telling the truth -- questionable whether he

9    is, but let's just say he is -- he's got some type of business

10   interest, you know.  To have a company that manufactures light

11   switches is not inconsequential.  That would conceivably throw

12   off enough money that he would have that money available to him

13   in a foreign country if he wanted to flee to that country.

14           THE COURT:  Or he could live abroad --

15           MR. RAPP:  Yes.

16           THE COURT:  -- and have a living somewhere else.  All

17   right.  I understand the point.

18           MR. RAPP:  So the other area of concern post the

19   filing of our detention motion is the pretrial service report.

20   And that's, to put it mildly, gives us a great deal of concern.

21           Just in two pages there are five contradictions about

22   the information that he was providing to pretrial services.

23   And as the Court, I'm sure, is aware that the touchstone of his

24   compliance under pretrial service conditions is his honesty and

25   candor with his pretrial service officer.

1        And in the first paragraph of what on the docket on --

2    is Page 2, when they're seeking to verify just simply his

3    family information, she -- his wife states, contrary to what

4    the defendant reported, she informed the defendant's only

5    sibling is alive and resides in Canada as opposed to what

6    Mr. Polzin told pretrial that his sibling was deceased.

7        And in the second paragraph on Page 2, contrary to

8    what the defendant reported, Mr. Pennock and Ms. Popsii

9    informed for the last five years the defendant resides between

10   Ukraine and Arizona.  Mr. Pennock reported the

11   defendant resides primarily in the Ukraine and twice yearly

12   returned to the United States for a two-month period.

13       So what the defendant was telling pretrial was

14   inaccurate.

15       And on --

16       THE COURT:  Do we know that?  Let me ask.  Do I know

17   where he's been living primarily?  I mean, even though there's

18   a discrepancy between these descriptions, do we actually know

19   which one of those is true?  I thought he lived primarily here.

20       MR. RAPP:  Well, we don't really know.

21       THE COURT:  Do you know or can you avow that, based on

22   your investigation, you have reason to believe he lives here

23   primarily?

24       MR. RAPP:  Well, here's what we know, is that he

25   purchased a house for about $375,000 in Gilbert in cash, and

1    that money is traceable to EIDL loans.

2              THE COURT:  Sure.

3              MR. RAPP:  Fraudulently obtained EIDL loans.  We know

4    that he's living in an apartment with his wife and this

5    individual Mr. Pennock while they're renovating this --

6              THE COURT:  Well, it seems to me you just check his

7    travel history -- I don't know if that's been done -- to

8    determine based on his passport when he's left and returned to

9    the United States as a United States citizen.

10             MR. RAPP:  Well, his travel is significant, as you

11   know from the --

12             THE COURT:  Yes.  24 times last two years.

13             MR. RAPP:  Yeah.

14             THE COURT:  But that didn't tell me how long he lives

15   here.  Does he spend most of his time in the Ukraine or most of

16   his time in the United States?

17             MR. RAPP:  We don't know, but we can only go -- We can

18   only -- Well, I mean, he's traveled extensively based upon the

19   TECS log that you see in Agent Luethans' declaration that has

20   extensive international travel.

21             That coupled with the two people who they're the only

22   two -- they're the only two people here today and the only two

23   people that had -- a pretrial service officer had access to,

24   they're telling us something completely different.

25             The defendant reported -- Mr. Pennock and Ms. --

1    informed for the last five years the defendant resides between

2    Ukraine and Arizona.

3           That's not you reside --

4           THE COURT:  Sure.  The response is going to be, well,

5    they just don't know his travel history accurately.  Of course

6    he knows it accurately.  I don't know which one is true.  But I

7    would think that the travel documents might tend to tell us his

8    travel history, his entry and exit from the United States, how

9    long he actually lives here.  If he in fact lived in the

10   Ukraine ten months out of the year, that would be significant.

11   I didn't do that work, but --

12          MR. RAPP:  Right.  So the only other thing we know is

13   he had a one-way ticket to the Ukraine, leaving on March 18th,

14   no return trip.  It isn't as if you're just going to the

15   Ukraine for a couple weeks.  He's going to the Ukraine maybe

16   for the rest of his life.  We have no idea.

17          But what the defense is arguing -- and I'm sure

18   they'll clear this up because it's confusing to me -- is that

19   the exhibit that they --

20          So not to get too far afield of what the questions

21   that the Court is asking is that in terms of the travel, this

22   CNN report comes out on March 5th, which is this article where

23   CPA clients of the defendant have grievances about the returns

24   he prepared on their behalf.  But also it talks about getting

25   six PPP loans fraudulently.  And then you have a one-way ticket

1    on -- to the Ukraine.  But I think what the defense is going to

2    argue is no, not so fast; that was booked before this article

3    came out.  And the argument is that that article might have

4    given him the impetus to flee the United States on a one-way

5    ticket, but the ticket that we have attached to the defense

6    response isn't for Mr. Polzin.  It's for Ms. Popsii.  And we

7    don't -- It's not clear, and I'm sure the defense would point

8    this out, if that's the case, but we -- this only shows one

9    passenger flying, her, not him.

10           So, in any event, getting back to the pretrial service

11   report, there is a substantial amount of contradictory -- The

12   only two people that know him the best is his wife, who he's

13   been married to for some time, and Mr. Pennock, who's some type

14   of a business associate with him.  They're the ones who are

15   telling us that he resides between the Ukraine and Arizona.

16   It's not -- He's not saying that he resides permanently in

17   Arizona and just travels to the Ukraine.  And that contradicts

18   his own information, which he's saying, hey, I have a

19   manufacturing business in the Ukraine, and, guess what, I just

20   have a vacation home in the United States.  So that gives us a

21   great deal of concern.

22           Then you go on to the third paragraph where, again,

23   his wife contradicts what Mr. Polzin is telling pretrial.

24   Contrary to what the defendant reported, she advised he

25   maintains daily contact with his oldest child when he is

1  actually saying that he's had very little contact with his

2  child.  But he's got a child that lives in another country,

3  Canada, not here.

4          Then you get down to paragraph four, again, contrary

5  to what the defendant reported to -- Mr. Pennock informed the

6  defendant owns and operates two additional businesses for

7  accounting and home automation.

8          This is contrary -- This is of course important to

9  know what his business interests are.  He has this TSP Imports

10 that he avows, but then Mr. Pennock, who is on some of the

11 business interests that Mr. Polzin has, he's saying that he

12 owns and operates two businesses, accounting and home

13 automation.  And I would just hit the pause button on this

14 accounting company, because this actually is significant for

15 the EIDL loans.

16         There is this -- these companies, these CPA companies.

17 One is Transparen, and the other is -- Transparen, LLC, and the

18 other is Transparen, sole proprietorship.  The owner is

19 Mr. Pennock.  Mr. Polzin is the member of these two companies.

20         I believe in just a brief discussion with Mr. Pennock,

21 he's saying that Mr. Polzin shouldn't be on those companies in

22 any fashion.  But the account associated with those two

23 companies where the money -- the EIDL loans were actually going

24 to the bank account, Mr. Polzin is the only signatory on those

25 accounts rather than Mr. Pennock, who apparently owns the

UNITED STATES DISTRICT COURT

1    company.

2         The other contradiction is on Page 3, the second

3    paragraph of Page 3.  Contrary to what the defendant reported,

4    Mr. Pennock informed the defendant operates four bank accounts.

5    He advised he's not aware of the balance for these accounts

6    where Mr. -- Mr. Polzin is saying he just has one account.

7         And Ms. Popsii, his wife, also says she's, contrary to

8    what the defendant reported, she's informed she is employed and

9    owns and operates a TSP export out of Ukraine.

10        So the business interests are a little bit convoluted.

11   There's a TSP that is some type of an import company but

12   also an export company, which I guess lends itself to maybe the

13   fact that he does have some manufacturing interests of these

14   light switches that he advised CBP about over in the Ukraine.

15        So these are the facts that we've obtained after he

16   was arrested and obviously after we filed our detention motion

17   seeking some type of explanation of his finances and requesting

18   at a minimum a significant bond to secure his attendance.

19   There's all these other conditions that we would require.

20        But at this point, given all the contradictions and

21   the opaque nature of his finances, at this point we would

22   request that he be detained.

23        THE COURT:  And when would that change in your mind?

24        MR. RAPP:  Well, first he would have to come forward

25   with a bond.  As you see in all these other white collar

UNITED STATES DISTRICT COURT

1      case --

2              THE COURT:  That's fine.  What else?

3              MR. RAPP:  Well, a full accounting that can be

4      confirmed by pretrial services.  And just so the Court's clear,

5      this isn't to further our investigation.

6              THE COURT:  I understand.  I'm just trying to get your

7      position.

8              MR. RAPP:  Yeah.  We're doing, as you can imagine, our

9      own investigation to drill down on some of these other

10     fraudulent acts, including the PPP loans that are not part of

11     the complaint at this point.  But he needs to be -- and he

12     hasn't been -- he needs to be candid with pretrial about his

13     business interests and his finances.  And he's a long way from

14     that.

15             THE COURT:  Let me ask you about those loans.  They're

16     listed in the complaint fact section $740,000 over a two-month

17     period.  There's a June 10th $218,000 loan.  Are those under

18     investigation by the government at this point?

19             MR. RAPP:  Yes.  So what's set forth, if I'm

20     understanding what the Court is asking --

21             THE COURT:  The reason I'm asking is is there a

22     suggestion then that he may have access to even much greater

23     quantities than the $450,000 that's charged?

24             MR. RAPP:  Yes.

25             THE COURT:  Okay.

1          MR. RAPP:  Yes.

2          THE COURT:  All right.  Thank you.  I may come back to

3    both of you twice.

4          So, Mr. Silver.

5          MR. SILVER:  Yes, Your Honor.  Before I lose it,

6    there's not a lot of power left on this phone.  So we didn't

7    have Mr. Polzin -- May I take this off?

8          THE COURT:  You can.

9          MR. SILVER:  Thank you.  We didn't have Mr. Polzin's

10   phone, so I inquired with his wife regarding their travel

11   plans.  And I received her itinerary.  I have on his phone here

12   it shows the same itinerary going from Kiev to Phoenix and then

13   Phoenix back to Kiev on the 13th.  The trip was later pushed

14   back to the 18th.  I can show that to the government.  I can

15   bring it up to the Court, and you can see it, or I can just

16   make an avowal to the Court.

17         THE COURT:  You can make the avowal.  It's less of a

18   concern than --

19         MR. SILVER:  I'd just like to show it to Mr. Rapp so

20   he can see it here.  Thank you.

21         Okay.  So the government, in their complaint they've

22   alleged three counts, which, you know, wire fraud for $450,000.

23   I don't know this because I don't have all the information on

24   this, but in my brief discussions with Mr. Rapp, the government

25   has already taken actions to forfeit the house, which is now

1   worth in excess of $450,000, which would be the amount of

2   alleged fraud in this case.

3           They've also forfeited or frozen several bank

4   accounts.  I don't have the information what's in those bank

5   accounts.  The dollar amounts, we have been unable to access

6   that without Mr. Polzin's help in that regard.

7           As far as the Porsche goes, I don't have evidence from

8   him because I haven't met with him on where those monies have

9   gone, you know.  Why was the Porsche sold?  The Porsche was

10  sold because they bought it.  They thought they were going to

11  use it.  It was sitting in the garage.  It wasn't being used.

12  And like a lot of people during this COVID times, people

13  weren't using their vehicles as much, so it was just taking up

14  space, and they sold it.  So it's pretty innocent.

15          But I think we have to go back and look at it and say

16  why is he traveling to Kiev?  Well, he's been with his wife now

17  approximately five years.  And she has a daughter there, a

18  14-year-old daughter.  I believe she's 14.  And they go back

19  and forth to Kiev.  His wife travels there to visit her

20  daughter, who also lives with the father.  And Mr. Polzin also

21  travels with her back and forth.

22          And every time they come back to the United States,

23  over and over and over again.  Mr. Polzin knew about the CNN

24  article.  In fact, the CNN reporter came to his house and

25  wanted to talk with him.

1          And then we get the -- the article comes out on March

2    5th.

3          So what would most people normally do?

4          Well, they would normally, if they knew about this,

5    they would have -- and they thought they committed a crime and

6    they were going to flee the country, they would have taken off

7    immediately.

8          But what did he do?

9          He was set to leave on the 13th -- I mean, sorry --

10   the, yeah, the 13th, and he had some more business things he

11   needed to attend to, so he even pushed his -- back his trip

12   five more days and stayed here five more days.

13         So he wasn't trying to flee.  They didn't catch him

14   with, you know, a pile of cash in his pocket trying to flee the

15   country or any receipts or anything else showing he's wiring

16   funds or doing other things to a foreign country.

17         He was going there on the second leg of his trip with

18   his wife, as he has done many, many, many times over the last

19   several years.

20         So I think you have to look at that and say there's

21   nothing untoward with that.  He's not trying to escape this

22   country.  Okay.

23         Now, upon information and belief, in speaking with his

24   wife, she's no Ukrainian law expert, but she tells me, as I put

25   in our papers, you can't own a business in Ukraine unless

1    you're a Ukrainian citizen.  He's not.  So --

2         THE COURT:  I'll assume he made those statements to

3    the Customs and Border Protection that he -- for the purposes

4    of this hearing.  They could be wrong.  But let's assume that

5    he said that he owned a business there that was making these

6    switches.  Should I or should I just assume that was a

7    miscommunication?  Is it your point that he does not own a

8    business there?

9         MR. SILVER:  I don't have any knowledge one way or

10   another that he does or he doesn't.  I mean, we can ask him

11   here today if he does.  We're not going to do that.

12        But I don't have any information that he has it.  The

13   government has information that was written by somebody in ICE.

14   Whether or not it's accurate or not, we don't know.

15        THE COURT:  Right.  So if his wife says you can't own

16   a business there, we don't actually know if that's true.  I

17   leave this as an open question is the point.

18        MR. SILVER:  It's an open question.

19        THE COURT:  Okay.

20        MR. SILVER:  So we have to look at this and say we

21   want to come back to court.  Right?  The government has made

22   all kinds of allegations in their papers, most of which are not

23   relevant here.  They're making allegations that he has

24   committed PPP loan fraud.

25        THE COURT:  Isn't that relevant, considering the

1    amount of money that's at issue?  If in fact he might be

2    connected to PPP loan fraud and it's in an amount approaching

3    $900,000, wouldn't that be relevant to his access to cash if in

4    fact he was involved in that?

5              MR. SILVER:  Well, as far as I know, the government

6    seized his accounts.

7              THE COURT:  They seized the accounts they know of.

8    You can't -- No one here knows they seized everything.

9              MR. SILVER:  Right.  Well, right.  At this point in

10   time they're allegations.  I don't know if he's used some of

11   that money or all that money, what he's done with that money.

12   I know they have a house in Mesa that they purchased this last

13   year, and they're fixing that house up, and they put a

14   tremendous amount of money into that house.  So that might be

15   where some or a lot of the money has gone.  I don't know.  I

16   haven't seen any receipts for that.

17             But we have to look at this defendant and say is he

18   going to come back?  Is he going to come back?  Is he going to

19   show up?

20             And you look at the pretrial service report, yeah,

21   there's inconsistencies.  We can all see that.  Why there are

22   inconsistencies, I don't know.  You don't know.  But I think

23   there's things that we can do here to guarantee he's going to

24   come back.  I think all the conditions that pretrial services

25   has put in there are reasonable conditions.  And the Court

1   seems to be a little bit concerned whether he's going to come

2   back or not.  I think if you threw an ankle monitoring system

3   on him, I think that would also help.

4          But as far as a bond goes, if the government hasn't

5   already seized, they're going to seize the rest of his assets,

6   and that will leave him, as I put in my papers, without any

7   monies to post a bond, thereby, you know, keeping him in,

8   detained, which would be very difficult to mount a defense,

9   because it appears as though the government may be bringing

10  other charges against him.  We have two IRS special agents here

11  in the courtroom with us here today.  They arrested him.

12         So I would anticipate some sort of maybe tax charges.

13  I don't know.  But I think an ankle bracelet in addition to the

14  conditions as requested by pretrial services would be adequate

15  to ensure that he comes back for any additional hearings in

16  this case.

17         And a bond, like I said, I think that's -- once the

18  government finds whatever assets he has and seizes them, he's

19  not going to have the money to be able to post in that regard.

20         THE COURT:  When I looked through the government's

21  exhibit, this is document 8-2 at 2, it's the listing of the

22  inbound and outbound of the United States.  This is just my

23  cursory review, but based on what I have here, let me draw your

24  attention to an event.  It says outbound July 9th.  Looks like

25  it left Atlanta, goes overseas, comes back to JFK on 11-19.  I

1    mean, if I read this record accurately, it would indicate that

2    he spent four months out of the United States.  I'm not saying

3    you know that for sure right now, but from what you can tell,

4    am I reading this accurately?

5              MR. SILVER:  You know, I don't know what information

6    the government used to put this together, so I don't know if

7    it's accurate or not.

8              THE COURT:  Fair enough.  I'll ask them.  But the

9    point I'm making -- And there's another entry, if you go up to

10   October 22nd and a return on January 29th, a three-month stay.

11   The point I wish to make is just that so far it would seem to

12   indicate that when he goes overseas, he does so for more than

13   just a week or two like a tourist, but he's in fact there for

14   months at a time, depending on why he's there.

15             Do you want to comment on it?  You don't have to.  But

16   based on what I have now, the point is that if you have what

17   would amount to almost a dual residence, the U.S. and the

18   Ukraine, that would potentially increase someone's risk of

19   flight because they could easily go somewhere where they've

20   already spent half of the year the year before.  I'd say that

21   to you because it's a concern.  It wasn't really brought up as

22   clearly before.

23             Do you have any response to any of that?

24             I know you don't have all the information in this

25   case, and we're early, but if I'm going to use this --

1          MR. SILVER:  I think every time you look here, he has

2   come back.

3          THE COURT:  Okay.

4          MR. SILVER:  He has come back just not for a week or

5   two weeks.  I mean, based on his coming back in January, so he

6   would have been here, you know, a month or so.  So he is

7   coming -- Every time he does come back to Arizona.  He does

8   come back to the United States.  He's not staying there for one

9   or two years at a time and then coming back for a week.  He

10  does have business interests here.  He does have this home that

11  he's recently purchased, and they're making this a smart home,

12  which is going to be part of the business that he has here in

13  the United States to try to sell smart home systems.

14          And he's going to be using this home as a showroom for

15  that.  And maybe that's the reason he had these European

16  switches or plugs or whatever they were with him.  I don't

17  know.  But that's part of his business plan that he has here,

18  you know.

19          The government is trying to make hay of the fact that

20  the CNN article says, oh, he's a fake tax return preparer.

21  Well, you know, Your Honor, as I indicated, you don't have

22  to -- you know, anybody can be a return preparer.  And it's

23  just more mud they're throwing up against the wall.

24          THE COURT:  Let me stop you.

25          MR. SILVER:  But I think there are things we can do

1    here to make sure he does come back.

2         THE COURT:  Hold up.  I understood that.  Let me get

3    to some more questions.  I understand your argument.  I'm

4    bringing these up so you can address them.  I know they're not

5    easy questions.

6         MR. SILVER:  I appreciate it, Your Honor.

7         THE COURT:  But at least you get a chance to respond

8    if you have one.  The second one is about the house.  June 19th

9    pays $385,000 in cash for the house.  Now, that's somewhat

10   unusual.  It's not completely unusual.  If he had sold another

11   home and received funds and bought this home, that would

12   explain why it was in cash.  There's an argument that these PPP

13   loans from April to June of $740,000, maybe those were

14   converted into cash for the house.

15        The question I have is do you have anything you'd like

16   to add as far as whether or not I should or not consider the

17   $385,000 in cash for the house on June 19th as indicative of

18   him using cash freely or was connected to something else?

19        MR. SILVER:  Well, Your Honor, what we don't have here

20   is we don't have his bank statements.  So we don't know how

21   much money was in that bank account at the time he made that.

22   We don't know if these are from other business interest

23   accounting things or other things that he had.  I don't have

24   the bank statements.  I don't know what went into it.  We have

25   no analysis on that.  So I can't comment on saying, I mean, the

1   government wants to say he had four hundred -- at least

2   $450,000 in EIDL loans that were fraudulent, and then he took

3   part of that, and he purchased this house, and then he took

4   part of that and purchased a Porsche.

5           Well, if we add those two together, you know, we're

6   well over -- we're in the $500,000 range.  So -- And the

7   government's only made allegations about $450,000 EIDL loans.

8   They haven't made -- They've -- They've talked about it, but

9   they haven't actually come out and said it.  They haven't

10  amended the complaint.  They haven't indicted him yet because

11  of obvious reasons to allege other items.

12          But I would have thought they had been investigating

13  these, and, you know, once they do the indictment or maybe

14  they're going to supersede and add these, but right now they

15  haven't done that.  So we don't know what's in the bank

16  account.  We don't know what went into the bank account.  We

17  don't have any bank statements, so we can't do an analysis on

18  that account.

19          But the government's already taken actions to forfeit

20  the house anyways, which is worth more than the $450,000 that

21  they allege is the fraud here.

22          THE COURT:  Okay.  I may come back to you for the

23  final word since you are -- you may have some things to add.

24  In that regard, is that correct?  The house, there has been a

25  forfeiture action in some regard regarding the house?

1          MR. RAPP:  Yes.

2          THE COURT:  So you think that that money that was put

3     toward the house, they think the money was unlawful proceeds,

4     or it's just it's an asset?

5          MR. RAPP:  Oh, no.  We've traced the money to the

6     purchase of the house, and we've placed a lis pendens on the

7     house.  With respect to bank accounts, we have not frozen any

8     bank accounts, so that's not -- that's not accurate.  If we do

9     a tracing analysis and we find that the bank accounts, once we

10    look at the bank accounts, I mean, the Court knows that you

11    have to get subpoenas out.

12         THE COURT:  Of course.

13         MR. RAPP:  Compliance has to be returned.  And some of

14    that's delayed during this time.

15         Then we will be in a better position to seek a

16    forfeiture of those accounts.  I would just say that, you know,

17    the article comes out on May 5th, not in some sort of obscure

18    newspaper but on CNN, and all of a sudden on May 18th it's a

19    one-way ticket.

20         I will tell you that he buys the Porsche.  I think

21    it's actually a hundred -- It's $157,000, right?

22         UNIDENTIFIED MALE SPEAKER:  One hundred fifty-nine

23    with tax, title, and --

24         MR. RAPP:  Okay.  It's a hundred -- The Porsche is

25    actually paid in cash for $159,000 a day or two after he

1   receives a fraudulent EIDL loan.  And this person who is a

2   business person, after this article comes out, he sells it at a

3   fairly considerable loss.  Usually Porsches don't depreciate in

4   value in a year time frame when he purchased it in 2020.  He

5   sells it at nearly a $40,000 loss a day before he's taking a

6   one-way ticket -- a one-way trip to the Ukraine -- to Ukraine.

7          So that's a concern.  What we have right now, in

8   addition to all the stuff that we have set forth in our

9   detention motion, all the factors that would militate for

10  detaining this defendant, we have him lying.

11         First, it's our position that he lies on the EIDL

12  loans to the United States Government under the penalty of

13  perjury.

14         He clearly lies to pretrial because he's contradicted

15  quickly by his wife and his putative business partner.

16         And then he lies -- Do I think he has a manufacturing

17  business -- if I had to take a bet on it, I would say probably

18  not -- a manufacturing business in the Ukraine?

19         It doesn't matter.  This is what he tells a law

20  enforcement agent, which, as the Court knows, is a crime to lie

21  to him.  That's what he tells him.

22         So we've got about seven or eight lies to law -- to an

23  arm of the court, to law enforcement, and to government

24  agencies that are making these loans available for people who

25  really need these loans.

1          So with all that, this defendant should be held

2     pending trial until he can come forward with a substantial bond

3     that is not traceable to illegitimate funds that would clearly

4     secure his attendance here at future court appearances plus a

5     whole host of other conditions that would include a full

6     disclosure to pretrial services of his financial background.

7          THE COURT:  All right.  Thank you.

8          Mr. Silver, the final word.

9          MR. SILVER:  Yeah, thank you, Your Honor.  I addressed

10    most of those issues --

11         THE COURT:  You did.

12         MR. SILVER:  -- that Mr. Rapp has talked about.

13         But it just occurred to me that pretrial services,

14    they're supposed to be a neutral party.  They're supposed to

15    look at all the evidence and information from all the parties.

16         And we have this neutral party, and what does this

17    neutral party find?

18         That defendant shall report as directed to pretrial

19    services.

20         Okay.  That's easy enough.

21         Shall not travel outside Arizona.

22         That's easy enough.  You guys have their passport.

23    He's not going to leave Arizona.  If he needs to, we can ask

24    for permission.

25         Shall not obtain a passport or other travel documents.

1          That's simple.

2          Shall reside at the address on file.

3          That's where he's going to live anyways because

4    they're fixing up the house.

5          And shall not obtain any new financial accounts

6    without prior notification and approval of pretrial services.

7          Standard things.

8          So we have somebody at pretrial services, a neutral

9    third party, has looked at all this, and this is what they come

10   up with.

11         I understand the Court has some reservations about his

12   frequency with travel to the Ukraine.  But I think if we put an

13   ankle bracelet on him, I think that would alleviate the Court's

14   concern.  And I think a bond would effectively keep him in

15   detention and not allow him to be out and to assist in his

16   defense of this case, which appears as we're going to be having

17   some new charges brought.  Thank you.

18         THE COURT:  Mr. Polzin, as you can tell, I've reviewed

19   all of this closely.  I read through every document.  You know

20   from my questions I took close notes.

21         I am going to detain you as a flight risk.  There is

22   something I will add at the end of this because there is a

23   number of -- well, there are a number of things I don't know

24   yet.  But let me tell you the Court's reasoning first.

25         So there are four factors for the Court to consider:

1    The nature and circumstances of the offenses are

2    serious.  They involve substantial amounts of money.  They

3    involve fraud.  These are significant.  I wish to make that

4    clear that these are serious offenses, each one of them.

5    Next, your history and characteristics.  You have no

6    prior history, criminal history.  You have worked in industry.

7    You have a business.  You have a family.  You have ties here.

8    There are a number of things that are a credit to you.

9    You also are allegedly involved in these offenses.

10   You are presumed innocent.  But at a hearing like this, the

11   Court is required to look at the type of offense and what it

12   concerns and just get a sense of the overall nature of your

13   potential risk of flight or danger when looking at the entire

14   case.

15   And this one involves fraud on more than one occasion

16   involving cash, disbursements from the government.  And the

17   fact that it happened on more than one occasion means, you

18   know, not only the premeditation of applying for these loans

19   and submitting them and taking the money, there's also

20   information here that you were connected with substantial

21   amounts of cash.  Those things increase your risk of flight.

22   And then your ties to the Ukraine.  Now, there's

23   nothing wrong of course with traveling, and you have your wife,

24   who's a citizen, and you have reasons to travel.  There is

25   nothing wrong with that.  But you have lived there off and on

1    for months at a time it appears.  And that means that you do

2    have a location out of the United States that you have been

3    comfortable residing in before.

4          So anyone who had the ability to go somewhere and live

5    for months at a time, that would increase their risk of flight

6    because it would be less difficult for them to leave.

7          So those factors, when I weigh them, they do slightly

8    favor your detention in this matter.

9          The first one definitely favors your detention.

10          The weight of the evidence of the government is the

11    least important factor, but that also favors detention here.

12    This type of offense, based on the information in the probable

13    cause statement, shows compelling evidence on behalf of the

14    government.

15          And, finally, the nature and danger -- nature of the

16    danger to the community if you were released.  This one's

17    mixed.  It slightly favors release.  You have been involved in

18    fraud.  I'm leaving out all the allegations of outside parties

19    saying that you didn't prepare taxes or you might have been

20    involved in other fraud.  I'll just leave that to the side and

21    not consider any of it.

22          Despite the fact that you have allegedly been involved

23    in fraud, there would be conditions the Court could fashion to

24    minimize your economic danger to the government or the

25    community.

1           But when I weigh all three of those, this is not a

2    close call.  The government has established by more than a

3    preponderance of the evidence that you're a flight risk.

4           So here's the second half of my point.  There's

5    evidence of substantial quantities of cash being involved,

6    whether it was the Porsche being sold, a sizable amount of

7    money, $120,000 in cash being given to you, the house purchased

8    in cash, which is now apparently potentially an asset that

9    could be forfeited, these bank accounts.  There's nothing wrong

10   with you talking with your wife about bank accounts, but I

11   don't think there's a clear understanding from the Court about

12   what your finances are and where the cash has been and where

13   it's going.

14          Now, you don't have any burden here.  The government

15   has the only burden of establishing these items.  And they've

16   established them.  They've established these cash transactions,

17   your access to cash, your travel internationally.

18          I bring this point up because if I'm going to look at

19   the other side of this to establish whether or not there's

20   enough information to mitigate that evidence, it's not here.

21   If anything, there are a number of question marks, and there

22   are more outstanding facts like these PPP loans, which could be

23   certainly upwards of $500,000 or even approaching a million

24   dollars in cash from the government, which would give you more

25   cash, give you more incentive to flee, and more ease to stay

1    out of the United States.

2           Now, your attorney knows that as this case develops --

3    He hasn't had this for very long.  He hasn't had nearly the

4    time the government's had to prepare.

5           When he gets information, he may have new information.

6    You certainly might, when you get a chance, actually,

7    Mr. Silver, to go through all this, you could potentially file

8    a motion in the future and say:  Now we know more.  We have new

9    information we didn't have at this hearing, and we can explain

10   some of these things.

11          And you may have a good argument.

12          On the other hand, the government may have a mountain

13   of evidence they have obtained since then, and they'll have

14   more information about cash and where it went.  I don't know.

15          But I have to make a decision now.  I can't postpone

16   it.  There's no doubt that there are significant issues

17   regarding where the cash has been and your assets, and those

18   increase your risk of flight because it's an uncertainty.

19          I don't need to get too far into the pretrial report.

20   You are required to be honest with pretrial services.  Some of

21   these discrepancies can be explained.  People don't know you as

22   well.  There are some that are more concerning.

23          But I don't have to go into the report.  What I can

24   rely on here is the allegation of fraud in the complaint and

25   the information in the probable cause statement.  And those

1    allegations of fraud are significant enough that they are by

2    far the more compelling factor here.

3           So that is the Court's ruling.  You will remain in the

4    custody of the marshal service while your matter goes forward.

5           If your attorney and the government continue to

6    work -- The government will be required to give them

7    disclosure.  But if there's new information, either party can

8    approach the Court in the future.

9           Mr. Silver, that's the Court's ruling.  Is there

10   anything you wish to make as a record now?

11          MR. SILVER:  Nothing further at this time.

12          THE COURT:  I don't know that there would be.  And

13   anything else for today's hearing?

14          MR. SILVER:  No, Your Honor.

15          THE COURT:  Mr. Rapp, on behalf of the government,

16   anything else?

17          MR. RAPP:  No, Your Honor.  We've turned over the

18   passport to pretrial services.

19          THE COURT:  Okay.  Finally, Mr. Silver --

20          MR. RAPP:  Or we're going to do that.

21          THE COURT:  Pardon me.

22          You don't have to, but did you want to say anything to

23   Mr. Polzin before we adjourn?

24          MR. SILVER:  Yes.  I want to say I understand you're

25   going to be in a 14-day pod there for quarantine.  At the end

1    of 14 days, I'll make arrangements to come down and meet with

2    you, and then we can discuss things that aren't going to be

3    overheard by other people.  Okay?

4              THE DEFENDANT:  Okay.

5              THE COURT:  Mr. Polzin, we're done for this afternoon.

6    You can go ahead and knock on the door behind you and let them

7    know that we're concluded.

8              All right.  Thank you, all.  We're adjourned.

9         (Proceedings recessed at 3:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                        C E R T I F I C A T E

2

3           I, LINDA SCHROEDER, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8           DATED at Phoenix, Arizona, this 2nd day of April,

9    2021.

10

11                                   s/Linda Schroeder

12                                   Linda Schroeder

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT